UNITED DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

JOHNNY AKINS,                              )
                                           )
                    Plaintiff,             )
                                           )
vs.                                        )          No. 1:05CV00044 ERW/AGF
                                           )
JO ANNE B. BARNHART,                       )
Commissioner of Social Security,           )
                                           )
                    Defendant.             )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This action is before this Court for judicial review of the final decision of the

Commissioner of Social Security denying Plaintiff Johnny Akins' application for

disability insurance benefits under Title II of the Social Security Act (SSA), 42 U.S.C.

§ 401, et seq.  The action was referred to the undersigned United States Magistrate Judge

under 28 U.S.C. § 636(b) for recommended disposition.  For the reasons set forth below,

the Court recommends that the decision of the Commissioner be affirmed.

Plaintiff, who was born on September 7, 1948, filed the present application for

benefits on August 5, 2003, claiming that he had been unable to work since January 27,

2003, due to a heart problems, which caused chest pains and shortness of breath and

interfered with his ability to lift and carry things and to concentrate and remember

instructions.  Tr. at 51, 69.  After his application was denied at the initial administrative

level, Plaintiff requested a hearing before an Administrative Law Judge (ALJ).  A hearing

was held on June 22, 2004, at which Plaintiff and a vocational expert (VE) testified.  On

September 28, 2004, the ALJ issued a decision that Plaintiff was not disabled as defined

by the SSA.  Plaintiff sought review by the Appeals Council of the Social Security

Administration and submitted additional medical evidence for the Appeals Council to

consider.  The Appeals Council denied Plaintiff's request for review.  Plaintiff has thus

exhausted all administrative remedies, and the ALJ's decision stands as the final agency

action.

Plaintiff argues that the Appeals Council should have remanded the case to the

ALJ, and that the ALJ did not properly assess Plaintiff's residual functional capacity

(RFC) and  credibility, resulting in a decision that was not based upon substantial

evidence on the record as a whole.

## BACKGROUND

### Plaintiff's Work History

Plaintiff's earnings record shows annual earnings from 1967 through 2002 of

approximately $10,000 to $40,000, with lower earnings in 1989 and 1998, and no

earnings in 1999.  Tr. 49-50.  On his application forms, Plaintiff wrote that for the past 15

years he had worked as a mechanic on heavy equipment.  Tr. at 52.

### Medical Record

In 1996 Plaintiff had an aortic valve replacement.  The record includes progress

notes from a medical clinic documenting Plaintiff's visits and treatment from February

28, 2001 through April 23, 2003. These notes refer to follow-up evaluations of Plaintiff's hypertension, coronary artery disease, anticoagulation (Coumedin) therapy, and his status post valve replacement. Tr. at 95-114. Plaintiff's noncompliance with his medications is mentioned throughout these notes, for example, on August 15, 2001, January 24, 2002, and August 23, 2002. Tr. at 101, 102, 112. The notes from October 29, 2002 reported that Plaintiff's hypertension was uncontrolled, and that he had been noncompliant with his medications, having failed to take his Lopressor (for high blood pressure), Lipitor (for elevated cholesterol), or Lotensin (for high blood pressure) for at least the last month. Tr. at 99.

On June 12, 2003, Plaintiff presented to Angela Patterson, M.D., to establish a treating relationship. According to Dr. Patterson, Plaintiff had no specific complaints and denied any chest pain or shortness of breath. A physical examination showed that Plaintiff's lungs were clear. Dr. Patterson continued Plaintiff on Coumadin, Lopressor for hypertension, Lipitor, and Paxil for depression. Tr. at 180-81.

On July 31, 2003, Plaintiff saw Dr. Patterson with complaints of chest pain and was hospitalized for a diagnostic cardiac catheterization. The procedure showed approximately 15% to 20% stenosis in two arteries. Continued medical management was recommended. A chest CT showed "mixed changes of chronic interstitial and chronic obstructive lung disease and a small emphysematous bullae in the left lower lung"; a chest x-ray showed mild congestive heart failure; and a venous imaging study showed no evidence of lower extremity deep vein thrombosis. Plaintiff was discharged on August 4,

2003, in stable condition. The discharge diagnoses included chest discomfort, bradycardia (slow heart rate), hypertension, and hypercholesteromia. Discharge medications included Paxil, Lipitor, Dyazide (for high blood pressure), Lotensin, and Coumadin. Tr. at 122-131.

Plaintiff was readmitted to the hospital on August 14, 2003, reporting three episodes of snycope (blackouts) since his hospital discharge ten days earlier. It was decided that a pacemaker should be implanted, and this procedure was performed successfully. Tr. 139-44.

On November 11, 2003, Plaintiff went to the emergency room with complaints of chest pain associated with nausea and shortness of breath. A chest x-ray showed no acute cardiopulmonary process. Tr. at 154. Attending physician Dennis Daniels, M.D., diagnosed atypical chest pain and discharged Plaintiff on his current medications. Tr. 150-51. On November 19, 2003, Dr. Daniels, of Executive Pulmonary Medicine, saw Plaintiff upon referral by Dr. Patterson for evaluation, in light of the July 2003 abnormal chest CT. Plaintiff reported that his chest pain was dull, chronic, and not associated with exertion or symptoms of reflux disease. Physical examination showed no wheezing. Dr. Daniels found no clear evidence for the cause for Plaintiff's pain and ordered further testing. Tr. at 215-16.

On November 17, 2003, Plaintiff contacted the Social Security Administration to report that he had developed chest pain. He is reported as having stated that he walked two miles a day at a very slow pace, stopping in the middle to rest for about 15 to 20

minutes; that he would get chest pain with and without exertion; that he would get short of breath after climbing a normal flight of stairs; but that he could do household chores without much problem.  Tr. at 74.  A November 18, 2003 chest CT showed evidence of bronchial cuffing/bronchitis.  Tr. at 170.  A pulmonary function report by Dr. Daniels on November 24, 2003, showed signs consistent with moderate restrictive lung defect.  Tr. at 164.

On December 16, 2003, cardiologist Joseph Rogers, M.D., examined Plaintiff, apparently upon referral from Plaintiff's doctor in Poplar Bluff.  An echocardiogram revealed normal left and right ventricular size and function, however mild mitral and aortic insufficiency was seen.  Dr. Rogers noted that Plaintiff had heart failure symptoms and atypical chest pain, but that more tests were needed to determine the cause.  Tr. at 203-05.

Also on December 16, 2003, a non-examining consulting physician, Kirk Bowman, Jr., M.D., completed a physical RFC assessment.  In check-box form, he indicated that  Plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk and sit for about six hours in an eight-hour workday.  Dr. Bowman also found that Plaintiff could push and/or pull, including operation of hand and/or foot controls, without limitation.  Dr. Bowman found that the evidence he reviewed did not establish any postural (e.g., climbing, balancing, stooping), manipulative, visual, communicative, or environmental limitations, except that Plaintiff was limited to occasional climbing and needed to avoid concentrated exposure to extreme

cold, extreme heat, fumes, odors, dusts, gasses, and poor ventilation. He checked the box indicating his opinion that the severity/duration of symptoms reported by Plaintiff was disproportionate to the expected severity/duration based upon Plaintiff's medically determinable impairments. Tr. at 191-97.

A lung study conducted on December 13, 2003, showed low probability of pulmonary embolic disease. Tr. at 218. On January 18, 2004, Plaintiff received emergency room care following a motor vehicle accident the previous day. He was assessed as having sustained a head injury and chest wall injury and was discharged to the care of his primary care physician. Tr. 240-41. A sleep study conducted on January 22, 2004, showed moderate obstructive sleep apnea. Tr. at 217. On January 28, 2004, Dr. Rogers again saw Plaintiff, who reported recent syncopal episodes, two of which resulted in automobile accidents. Dr. Rogers wrote that the etiology of these episodes was not obvious, and he had Plaintiff hospitalized for syncope evaluation. Tr. at 201. A chest x-ray dated February 11, 2004, showed no evidence of arrhythmogenic right ventricular dysplasia. Tr. at 199. On February 12, 2004, Dr. Rogers wrote to Dr. Patterson that Plaintiff underwent an exercise echocardiogram, an EEG, and a head and chest CT, all of which were negative. Dr. Rogers wrote that he had restricted Plaintiff from driving for six months, but that he could not determine the cause of Plaintiff's syncopal episodes. He noted that there was no obvious malfunction of Plaintiff's pacemaker, and that he did not believe that Plaintiff's chest pain was cardiac in origin. Tr. at 198.

The record contains routine follow-up notes from Dr. Patterson dated January 29, 2004 through April 27, 2004. Tr. at 226-31. On February 24, February 26, and April 27, 2004, Plaintiff denied being short of breath or having any chest pain. The record also includes a letter dated April 20, 2004, from Plaintiff to the ALJ describing his problems. He wrote that he had enjoyed his work as a heavy equipment mechanic and would work now if he could. He stated that his chest pains varied in severity, and sometimes he had them even at rest. He also stated that he had had three blackouts in the last six months, with one of the times being after his pacemaker was installed, and that he was under doctor's instructions not to drive anymore. Plaintiff also wrote that his breathing was getting very bad, and that even with the help of an inhaler, he would still get out of breath after walking 50 or 60 yards. Tr. at 89-90. Plaintiff's prescription medications list as of April 28, 2004, included Coumadin, Lotensin, Paxil, Furosemide (a diuretic), two medications for muscle cramps, Advair and Atrovent for breathing problems, and two medications for gout. Tr. at 94.

On May 2, 2004, Dr. Daniels examined Plaintiff again and assessed sleep apnea and probable narcolepsy. He also assessed chronic bronchitis with bronchiectasis,[1] allergic rhinitis, and sinusitis, all of which contributed to his shortness of breath which was "multi-factorial." Dr. Daniels also reported that Plaintiff had diastolic dysfunction

---

[1] Bronchiectasis is an abnormal destruction and dilation of the large airways. Symptoms include coughing, shortness of breath, fatigues, wheezing, and clubbing of fingers (abnormal amount of tissue in the fingernail beds). www.nlm.nih.gov/medlineplus/ency/article/000144.htm

and intrinsic heart disease.  He noted test results which indicated that Plaintiff could have asthma and that he would respond to steroid therapy.  Dr. Daniels prescribed Claritin and instructed Plaintiff to continue his Advair, Flonase (a nasal spray used for relief of allergy symptoms), and Combivent (an inhalation aerosol).  Tr. at 212-14.

On June 11, 2004, Dr. Patterson wrote a letter "To Whom it May Concern" briefly noting Plaintiff's heart condition and more recent chest pains.  She wrote that the worst thing at that point was his continued syncopal spells, noting that this resulted in a motor vehicle accident several month ago.  Tr. at 223.

**Evidentiary Hearing**

Plaintiff testified at the evidentiary hearing held on June 22, 2004, that he was 55 years old, had completed 12th grade, lived in a house with his wife, and was 6 feet tall and weighed 250 pounds.  Plaintiff reviewed his work history, testifying that his last job was a  supervisory position as maintenance manager from July 2002 to January 2003.  He testified that he could not deal with the stress of the job, had confrontations with other managers, and that he was told he was not needed anymore.  After that, he worked in April/June 2003 for four or five weeks as a mechanic, but he could not meet the lifting requirements.  Tr. at 470-77.

Plaintiff testified that after his valve replacement and pacemaker, he was still having chest pains, but that his breathing difficulties were causing him more problems than his heart condition.  He testified that he was diagnosed with chronic bronchitis, and that even walking short distances caused shortness of breath and sometimes he had to get

up in the middle of the night to use his inhaler for some air. Plaintiff testified aerosols, smoke, leaves, grass, and diesel fumes all caused him to have trouble breathing. Tr. at 478-80.

Plaintiff stated that his chest pain started while he was working in the supervisory position, about five years after the valve replacement. He stated that sometimes the pain felt like he was having a heart attack. On those occasions he would take nitroglycerin, which relieved his symptoms. Plaintiff testified about the three blackout spells noted in his letter to the ALJ. He stated that physical activity and stress made his chest pains worse, and that he experienced these pains about eight-to-ten times a week. Tr. at 481-85.

Plaintiff testified that he would start wheezing after walking 50 or 75 feet, but that he had no trouble sitting or standing in one place (except that he currently had gout in his right foot). He stated that he could bend over, stoop, and pick up items, but that Dr. Rogers had told him not to lift anything weighing more than ten pounds. Plaintiff also stated that he could no longer push or pull things, and he even had trouble working on his own vehicle. Plaintiff testified that he got up at about 6 a.m. and spent his day watching TV, doing things around the house, tinkering with mechanical things, working in the yard, and going fishing with his friends. Although he could do some yard work, he could no longer mow the lawn due to his breathing difficulties and allergies. Plaintiff testified that he went to church once a week, and that he had to give up hunting because he could not be out in the cold due to his breathing problems. He testified that when it was cold outside, he had to stay indoors, and he stated that when it was humid, "I can't breathe. I

can't get any air."  He testified that he could climb a flight of stairs, but had to do it

slowly, and that he took Claritin D and used two inhalers, each two times a day, for his

allergies.  Plaintiff testified that he enjoyed going for coffee with his friends and "flirting

with the girls," stating "I'm still alive.  I just can't breathe too good."  Tr. 485-94.

The ALJ asked the VE whether there were any jobs available for an individual of

Plaintiff's age and vocational and educational background, who could perform light

work,[2] but was precluded from working from heights or at jobs requiring balance or

driving motor vehicles, and required a clean-air and climate-controlled environment.  The

VE responded that such an individual could work at electronic parts assembly jobs, at the

---

[2]     "Light work" is defined in 20 C.F.R. § 404.1567(b) as

> work that involves lifting no more than 20 pounds at a time with frequent
> lifting or carrying of objects weighing up to 10 pounds. Even though the
> weight lifted may be very little, a job is in this category when it requires a
> good deal of walking or standing, or when it involves sitting most of the time
> with some pushing and pulling of arm or leg controls. To be considered
> capable of performing a full or wide range of light work, you must have the
> ability to do substantially all of these activities.

Id.  Social Security Ruling (SSR) 83-10 further explains,

> [s]ince frequent lifting or carrying requires being on one's feet up to two-thirds
> of a work day, the full range of light work requires standing or walking, off
> and on, for a total of approximately 6 hours of an 8 hour work day.  Sitting
> may occur intermittently during the remaining time.  The lifting requirement
> for the majority of light jobs can be accomplished with occasional, rather than
> frequent, stooping.  Many unskilled light jobs are performed primarily in one
> location, with the ability to stand being more critical than the ability to walk.

SSR 83-10, 1983 WL 31251, at *6 (1983).

semi-skilled level, and that such jobs were available in significant numbers in the national economy. The VE further testified that there were jobs available in significant numbers at the sedentary level[3] that the hypothetical individual could perform, such as maintenance dispatcher or two-truck dispatcher. Tr. at 499-500.

**ALJ's Decision**

In reviewing the medical evidence, the ALJ noted Plaintiff's documented history of noncompliance with medical advice. The ALJ concluded that Plaintiff had severe impairments, including hypertension, post valve replacement, and syncope, but that these impairments did not singly or in combination meet any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ noted the absence of any specific limitations in Plaintiff's physical capacity in Dr. Rogers' February 12, 2004 letter, or in Dr. Patterson's letter of June 11, 2004, other than an indication that Plaintiff should not drive. Tr. at 15 & 16.

The ALJ found that Plaintiff's testimony was partially credible, but not to the extent of establishing disability. The ALJ noted that in evaluating Plaintiff's credibility,

---

[3]     Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

he considered Plaintiff's noncompliance with medical advice. The ALJ stated that Plaintiff's testimony that he could not get enough air was inconsistent with the medical record. The ALJ also found that Plaintiff's daily activities, including going shopping, fishing, and going to church, were inconsistent with disability and consistent with the ability to perform work activities. Tr. at 17.

The ALJ determined that Plaintiff had the RFC to do light work, noting that this assessment was based upon viewing the evidence in the light most favorable to Plaintiff, as Dr. Bowman had found that Plaintiff could do medium work. The ALJ held that Plaintiff's RFC to do the full range of light work was reduced by his inability to do work at heights and around moving machinery, work requiring balance, work not providing a clean-air environment, and work requiring driving motor vehicles. The ALJ noted that under the Commissioner's Guidelines found at 20 C.F.R., Part 404, Subpart P, Appendix 2, an individual of Plaintiff's age, education, and work experience, who was able to do the full range of light work, was not disabled. Using this as a framework for decision-making, in conjunction with the VE's testimony, the ALJ found that there were a significant number of jobs in the national economy that Plaintiff could perform, such as electronic parts assembly and maintenance dispatcher. Accordingly, the ALJ determined that Plaintiff was not disabled as defined in the SSA. Tr. at 16-18.

**New Evidence before the Appeals Council and the Appeals Council's Decision**

Plaintiff sought the review of the Appeals Council, submitting additional evidence from the Tinsley Medical Clinic (Dr. Patterson), Poplar Bluff Medical Center, and St.

Louis University Hospital. These records indicate that on October 19, 2004, Dr. Patterson admitted Plaintiff to the Poplar Bluff Medical Center due to complaints of vague left-sided chest pain radiating over the left side of his body. Dr. Daniels noted Dr. Patterson's report that Plaintiff had decreased his follow-up visits and had been noncompliant with his medications. Tests revealed that Plaintiff had a narrowed aortic valve replacement with heavy calcification, a leak where the valve was sutured to the myocardium that would likely need surgical repair, dyspnea[4] (breathlessness), shortness of breath with exertion, and mild to moderate obstructive lung defect. Plaintiff was discharged on October 22, 2004 in stable condition, for follow-up at St. Louis University Hospital. Tr. at 250, 262-75.

A cardiac catheterization report from St. Louis University Hospital dated October 29, 2004, revealed moderate to severe aortic stenosis and a possible malfunction of the valve. Tr. at 360-61. He was admitted to the hospital on November 9, 2004, for a mitral valve replacement. The surgery was performed on November 11, 2004. Plaintiff did well during the procedure and was discharged from the hospital on November 19, 2004, in stable condition, with medications and follow-up instructions. Tr. at 370-71 (Clinical resume). Upon discharge, Plaintiff was limited to lifting no more than five pounds. Tr.

---

[4] Dyspnea is "[s]hortness of breath, a subjective difficulty or distress in breathing, usually associated with disease of the heart or lungs; occurs normally during intense physical exertion or at high altitude." Stedman's Medical Dictionary 535 (26th ed. 1995).

at 369.  The Appeals Council made the additional evidence part of the record, and on

February 17, 2005, summarily denied Plaintiff's request for review.  Tr. at 4-6.

## **DISCUSSION**

### **Standard of Review and Statutory Framework**

In reviewing the denial of disability benefits, a court must affirm the

Commissioner's decision "so long as it conforms to the law and is supported by

substantial evidence on the record as a whole."  Reed v. Barnhart, 399 F.3d 917, 920 (8th

Cir. 2005) (quoted case omitted).  This "entails 'a more scrutinizing analysis'" than the

substantial evidence standard.  Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th

Cir. 1989)).  The court's review "'is more than an examination of the record for the

existence of substantial evidence in support of the Commissioner's decision . . .  the court

must "also take into account whatever in the record fairly detracts from that decision."

Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)).  Reversal is not

warranted, however, "'merely because substantial evidence would have supported an

opposite decision.'"  Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir.1995)).

In order to qualify for Social Security disability benefits, a Plaintiff must

demonstrate an inability to engage in any substantial gainful activity by reason of a

medically determinable impairment which has lasted or can be expected to last for not

less than 12 months.  42 U.S.C. § 423(d)(1)(A); Barnhart v. Walton, 535 U.S. 212, 217-

22 (2002) (both the impairment and the inability to engage in substantial gainful

employment must last or be expected to last not less than 12 months).

To determine whether a claimant is disabled, the Commissioner employs a five step evaluation process. First, the Commissioner decides whether the claimant is engaged in substantial gainful activity. If so, disability benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, defined in 20 C.F.R. § 404.1520(c) as an impairment which significantly limits an individual's physical or mental ability to do basic work activities.

If the claimant's impairment is not severe, disability benefits are denied. If the impairment is severe, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in Appendix 1 (20 C.F.R., Pt. 404, Subpt. P). If the claimant's impairment is equivalent to one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is one that does not meet or equal a listed impairment, the Commissioner asks at step four whether the claimant has the RFC to perform his or her past relevant work.

If the claimant is able to perform his or her past relevant work, he or she is not disabled. If the claimant cannot perform his or her past relevant work, step five asks whether the claimant has the RFC to perform work in the national economy in view of his or her age, education, and work experience (vocational factors). If not, the claimant is declared disabled and is entitled to disability benefits. 20 C.F.R. §§ 404.1520(a)-(f); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003).

The claimant bears the initial burden at step four to show that he or she is unable to perform his or her past relevant work. Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir.

1998).  If met, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors.  Id.  Where a claimant cannot perform the full range of work in a particular category of work listed in the regulations (very heavy, heavy, medium, light, and sedentary), due to a nonexertional impairment such as pain or depression, the ALJ must consider testimony of a VE to meet her burden.  Id.; Wilcutts v. Apfel, 143 F.3d 1134, 1137 (8th Cir. 1998).

The response of a VE to a hypothetical question that includes all of a claimant's impairments properly accepted as true by the ALJ constitutes substantial evidence to support a conclusion of no disability at step five.  Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001) (the hypothetical "must capture the concrete consequences of the claimant's deficiencies").  Here the ALJ decided at step five that based upon the VE's testimony, there were jobs in the economy that Plaintiff could perform.

**Appeals Council's Failure to Remand the Case**

Plaintiff first argues that the Appeals Council should have remanded the case to the ALJ in light of the new evidence it received regarding Plaintiff's valve replacement surgery on November 19, 2004.  Plaintiff argues that this evidence shows that Plaintiff testified credibly at the June 22, 2004 hearing.  Plaintiff further argues that the limitation placed upon him following this surgery of lifting no more than five pounds ruled out his

ability to do light work, or even sedentary work, and that the ALJ's decision thus was not based upon substantial evidence.

The Commissioner's regulations provide that "[t]he Appeals Council will consider all the evidence in the [ALJ] hearing record as well as any new and material evidence submitted to it which relates to the period on or before the date of the [ALJ] hearing decision." 20 C.F.R. § 404.976(a)(1). By adding the new evidence to the record, the Appeals Council determined that it was material and related to the period on or before the ALJ's decision. Although Plaintiff's condition after the November 2004 surgery would not be directly relevant, the additional evidence is material to the extent that it sheds light on Plaintiff's condition before the date of the ALJ's decision. This Court must thus decide whether the ALJ's decision is supported by substantial evidence in the whole record, including the new evidence. See Gartman v. Apfel, 220 F.3d 918, 922 (8th Cir. 2000).

**ALJ's Determination of Plaintiff's RFC and Discrediting Plaintiff's Testimony**

Plaintiff argues that the evidence does not support the ALJ's determination that Plaintiff had the RFC to lift 20 pounds occasionally and ten pounds frequently, or that he could stand six hours in an eight-hour workday, as is required for light work. Plaintiff argues also that the ALJ erred in not crediting Plaintiff's testimony that he would start wheezing after walking 50 or 75 feet, and that Dr. Rogers told him not to lift more than ten pounds. Plaintiff further asserts that the ALJ should have considered Plaintiff's strong work record in evaluating his credibility.

Plaintiff contends that as a result of the ALJ's errors, the hypothetical question posed to the VE was flawed, and that the VE's answer did not constitute substantial evidence upon which to base a decision that Plaintiff was not disabled. In a footnote, Plaintiff adds that the ALJ's hypothetical was further flawed because it did not include any mental limitations. Plaintiff points to references in the medical record to his being prescribed Paxil, and to his testimony that previous jobs were unsuccessful due to stress.

A disability claimant's RFC is the most he can still do despite his limitations. 20 C.F.R. § 404.1545(a)(1). In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Id. at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Thus, before determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). In Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984), the Eighth Circuit held that the "absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints." An ALJ must also consider observations by third parties and treating

18

and examining physicians relating to such matters as (1) the claimant's daily activities; (2) the frequency, duration, and intensity of the symptoms; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.  Id.  "If the ALJ discredits a claimant's credibility and gives a good reason for doing so, [the court] will defer to [his] judgment even if every factor is not discussed in depth."  Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001).

In many disability cases, there is no doubt that the plaintiff experiences pain; "the real issue is how severe that pain is."  Sampson v. Apfel, 165 F.3d 616, 619 (8th Cir. 1999).  Here, the record establishes that during the relevant time period, Plaintiff experienced chest pain and breathing problems.  The cause of his chest pain was not known at the time of the hearing or the ALJ's decision.  It may well be that the cause was the heart condition for which surgery was performed after the ALJ's decision.  In any event, the question in this case is whether the chest pain Plaintiff experienced, or his condition in general, precluded him, at the time of the ALJ's decision, from engaging in substantial gainful activity.  Although there is evidence in this record that could support a different decision, upon review of the entire record, the Court concludes that the Commissioner's decision that Plaintiff was not disabled is based upon substantial evidence.

As the Commissioner points out, the ALJ considered Plaintiff's noncompliance with his medications in evaluating Plaintiff's credibility with regard to the severity of his impairments.  The Eighth Circuit has held that noncompliance with medications can be

grounds for discrediting a claimant's subjective complaints.  See Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005); Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005).

The ALJ also pointed to Plaintiff's daily activities, including going shopping, going fishing, and going to church, as inconsistent with disabling impairments.  The Court notes that in addition, Plaintiff testified that he did yard work (though not mowing, due to his allergies), household chores, and met his friends for coffee.  The Court believes that the ALJ was entitled to find that Plaintiff's level of daily activities was consistent with light work requirements, subject to the limitations added by the ALJ in his RFC assessment, that is, the preclusion of working at heights, around machinery, and driving motor vehicles; and the requirement of  working in a clean-air environment.  See, e.g., Gray v. Apfel, 192 F.3d 799, 804 (8th Cir. 1999) (claimant's ability to care for himself, do household chores, drive car for short distances, and perform other miscellaneous activities were inconsistent with level of pain alleged).  The Court further notes that one of the available jobs, that of maintenance dispatcher, that the ALJ found Plaintiff could perform based upon the VE's testimony, was at the sedentary level of work.

The absence in the record of any doctor's opinion that Plaintiff needed to restrict his activities due to his heart condition or breathing problems is also supportive of a finding that he is not disabled.  See Raney v. Barnhart, 396 F.3d 1007, 1011 (8th Cir. 2005) (ALJ's finding that plaintiff was not credible to the extent that she claimed she was unable to work was proper in light of evidence of noncompliance with medications, activities of daily living, and absence of any medical opinion stating that the plaintiff was disabled); Brown

v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (lack of significant medical restrictions was inconsistent with complaints of disabling pain). The restriction that Plaintiff not drive due to syncopal episodes was taken into account by inclusion in the ALJ's hypothetical question to the VE of the inability to do work at heights and around moving machinery, or to do work that required balancing or driving motor vehicles.

Although the ALJ did not mention Plaintiff's strong work record, this is only one of the relevant factors. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 970 (8th Cir. 2003) (ALJ did not err in discounting claimant's subjective complaints of pain even though ALJ incorrectly evaluated claimant's strong work history; "As Polaski makes clear, work history is only one factor among many to be considered.").

As noted above, Plaintiff argues in a footnote that the ALJ also erred in not including in his hypothetical question to the VE any mental limitations. Plaintiff, however, did not mention depression or any other psychological impairment on his application forms. The Court does not believe that the references in the medical record to Plaintiff taking Paxil, or his testimony at the hearing that he had difficulty dealing with the stress of managerial jobs he attempted, required the ALJ to find that Plaintiff had a severe mental impairment which should have been factored into the hypothetical question. Cf. Pena v. Chater, 76 F.3d 906, 909 (8th Cir. 1996) (ALJ was under no duty to develop evidence of claimant's depression where it was not presented in his application or mentioned during his testimony). The Court notes that the jobs suggested by the VE in the present case were not

managerial jobs.   In sum, the Court concludes that the ALJ's evaluation of Plaintiff's credibility and the ALJ's RFC assessment were proper.

## **CONCLUSION**

The record, including the VE's answer to the hypothetical question posed by the ALJ, constituted substantial evidence in support of the Commissioner's decision that Plaintiff was not disabled, as that term is defined by the Social Security Act.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

The parties are advised they have eleven (11) days to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.

AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 24th day of February, 2006.